Case number 16-5310 at L. Mary E. Collins individually and on behalf of all other similarly situated at L appellants for suspension benefit guaranteed corporation at L. Mr. Akes for the appellants, Ms. Hagen for the appellees. Mr. Akes, good morning. Good morning. May it please the court, John Akes on behalf of the appellants. I've asked for five minutes to be reserved in rebuttal. We are here this morning because the district court below denied a motion for attorney's fees filed by my clients related to a long-running case related to ERISA benefits. Underlying the district court's and animating the district court's decision, as well as PBGC's provision, position in this case, is that the attorneys have simply earned enough in this case. We believe the district court earned... Underlying it was that they've earned what they'd agreed to, as opposed to earned enough. Well, that gets to the two ways, Your Honor, that we believe the district court earned in its decision. Number one... I'm sorry, Your Honor. That's not a very accurate statement to say that what underlined it was the thought that the attorneys had earned enough, unless you're equating enough with a perception of what the agreement was. Well, it animated his decision that we've earned a lot of money in the case, and we can't deny that, Your Honor. But in interpreting the agreement, the district court earned because it did not look at it as a whole. And we think the easiest way to dispose of the case is under the doctrine of prevention, with the district court clearly did not apply the law appropriately and applied the wrong evidentiary standard for us to prove the doctrine. So your theory is a claims-made basis. That was why the wrap-up agreement contained a condition such that the prevention doctrine would apply? Our position is that the phrasing of the attorney's fees provision, that the attorneys, in effect, get paid when the benefits are paid to the claimants, it is a claims-made policy. Mostly in class actions, the attorneys are asking for a percentage of the common fund, the total fund. We didn't do that here. We tried to align our interests in ensuring that the parties found beneficiaries and paid them. So let me just understand what happened here. When the wrap-up agreement was signed, when was the $250,000 paid to you in connection with making efforts to find these additional beneficiaries? That occurred later in 2013. Let me give a quick timeline. The agreement signed in 2002. We have problems through 2007. Magistrate Judge Robinson orders that these issues and processing go back to something called CASB, which is this settlement board. In 2002, all you had was the wrap-up agreement itself in terms of what you might be entitled to by way of attorney's fees. Going forward, when payments are made, they are supposed to deduct 8% going to class counsel. That 10-year period. I'm just focusing. Right. That's what the language says, but it's conditional. We believe in regard to misinterpreting the contract as a whole, if I can go to that quickly, the district court erred in not reading the agreement as a whole and looking at that conditional language and saying when benefits are paid is incorporating the payment and processing standards, which were set out at the beginning of the agreement. Under their theory and the district court's theory. In your brief, you tell us to read or you focus on pages 1 and 2 of the wrap-up agreement. I went back to read them. I see the general description, but where do you pick up this condition claims made theory? That language is in the attorney's fees provision. Based on the course of dealing of the parties, Your Honor, these processing standards, which are laid out in the first pages, it specifically says PBGC is to use the standards used by the settlement director. We pick up between 2002 and 2007 that they're not. They're adding a bunch of different conditions, which is set forth here and not disputed, that the settlement director did not follow. So that goes to the contract issue, and it also goes to the prevention doctrine. They were preventing the claims from being made in accordance with the agreement. And so under the contract theory, their view is we could have not paid for ten years and we're still in agreement or we're still in compliance with the agreement. So the district court says, well, but I look at what actually was happening during this period, and a lot of claims were being paid, and there was some drop-off, but there's an explanation as to why. Why isn't that a clear error? I know you want to say it's a matter of law. Our view is he applied the wrong standard. He says all the fault can't be laid at PBG's feet. That's not District of Columbia law, which the parties agree here apply to the consent decree. Plus at page 9 of his. . . Well, let me just interrupt. I'm not sure that Judge Roebuck understood it. I want to ask him a question. What is it you're saying is D.C. law that they're not consistent with? The judge below seemed to apply an all-or-nothing approach, that we had to prove all fault has to be laid at PBG's feet. That's not the standard. The standard is substantially hindered or contributed materially. And the facts. . . You're on the prevention doctrine. Yes, sir, I'm on. . . Your Honor, I'm on the prevention doctrine. You have a case where the prevention doctrine has been applied by the D.C. court in a case where it's not a conditional duty and the party is accused of preventing the completion of the condition? This. . . Our view is this is a conditional contract, to be clear. I'm maybe not understanding your question, but we cited. . . This is a conditional contract. Yes, sir. What is the condition that they prevented your client from completing? They didn't appropriately pay the benefits. What is the condition that you say existed for their performance of duty, for your performance to trigger their duty, which they prevented you from complying with? No, no. We don't have to be. . . The condition is we get paid when the claimants get paid. That's the condition. We can't get paid until they process and make payments. What they did, and in the record, it is undisputed that hundreds of people were identified prior to 2013. In fact, prior to 2007. But they haven't prevented you from performing because you had nothing to perform at that point. Exactly. The prevention doctrine says one party prevents the other party from performing, and you had nothing to perform except to collect attorney's fees. No, we were helping, as we had been doing. We were helping identify, locate, and then PBGC was to process. How did they prevent you from doing that? They wouldn't give us the data, Your Honor. So after this referral in 2007, by 2009, we agree in a joint status report to the court that PBGC would pay a million dollars for a relocator project. Again, hundreds of people had already been found and given to PBGC, and PBGC had not paid them. That's the prevention. This is the status report of what date? It is a 2009 joint status report filed by the parties. Following up on Judge Chantel's point and Judge Henderson's point, why isn't your theory more that there was a breach of the wrap-up agreement to the extent that the corporation was not applying the standards that were set forth on pages 1 and 2? We were going toward that, Your Honor, when the referral was made by the magistrate judge as affirmed by Judge Roberts to send these breach issues, compliance issues, back to CASB. They then holed up CASB for a period of time. By 2009, we agreed to this $1 million relocator project. Counsel, help me. CASB is the chairman of the board? CASB is a five-person body. Oh, okay, it's the board. It's the Planned Session Settlement Board, yes. Okay, just so I know who you're talking about. Yes, I'm sorry, Your Honor. That's all right, there are too many initials. Okay, so the magistrate judge says the case should go back to the board. Correct. For the board to make these decisions about is the corporation properly applying the standards in the wrap-up agreement? Correct. In essence, are they complying with the agreement? Then what happens? Then what happens, in lieu of allowing an audit to determine compliance, in 2009, PBGC agrees with us to the relocator project to go find the people we had already found, re-notice them, and allow them to collect the payments. That's why, if you look at our chart, the payments are huge in 2002 and 2003, in part because the settlement director was involved prior to the transfer over. It drops significantly. There's 24 to 28 months of no payments in this time period. Then, come 2013, when they finally fund the relocator project, but only to the tune of $250,000, and class counsel goes into his own pocket for $250,000 more, do we re-find folks, hundreds of folks, the vast majority of folks, that PBGC simply had not processed and paid? Then $25 million is coming out of the coffers to make those payments. Since then, even more has come out. That goes to the doctrine of prevention and to how they did not comply with their agreement. That's two different things, whether the doctrine of prevention applies and whether they have not complied. That seems to sound more like arguing a breach than arguing prevention. Ted Henderson and I, at least, and maybe Joe George, are all troubled by the idea that the prevention doctrine applies at all. Here's the prevention. As of 2007, the issue of breach is supposed to go back. In 2009, the parties agreed to the relocator project. From 2009 to 2013, they don't pay for the project per the agreement. What was your duty that they prevented you from performing? Helping to relocate the people, Judge Suntil. We can't perform our duties to the class, along with the navigant who's supposed to also go find these people, to do that. Are they pleading a defense to a breach action that which defense says, we don't have to pay because you didn't perform a duty? I'm reading their defense as that 10-year period is a 10-year period. We're not paying anything beyond that. They are not pleading a breach on your part to which you are replying that you were prevented from performing your condition. I don't have to do that under the doctrine of prevention. Your answer would be no. That's correct. If that's correct, is there any DC case that applies to the prevention doctrine in that circumstance? We cited you to the Brown and Root case out of the Fourth Circuit. Perhaps I'm misunderstanding your question because I believe the Arnoff case speaks to this doctrine of prevention that it's not a defense to us. It is a claim that they prevented us from doing what we agreed to do in 2009. And then because of that, they run out the clock and then make all the payments after the 10-year period. I see I'm short on time. I'd like to reserve the remainder for rebuttal. All right. Ms. Hagan? Good morning. Good morning. Can I ask you a question up front? Sure. Is 8% a normal class action attorney's fee percentage? I don't know. I just wonder, is that something that either PBGC pays customarily or is it? Okay. I'm not sure. In this case, it's been, I think, anything but customary. May it please the court. You may not even have been born when this case started. You're very kind, Judge Simpson. Very kind. So what about this argument that you just heard? It's absolutely incorrect. So in 2009, that's when the parties or what, the corporation agreed to this relocator effort? It was never set in stone. I think the parties were going back and forth with respect to the locator fees. In the wrap-up agreement, there's a three-year period locator fee agreement, which was extended. Let me go back then, just so I understand. When the magistrate sent the case back to the board, the board was supposed to resolve all these disputes. At some point, did not the parties understand that the corporation was going to make this relocator effort and devote a million dollars to it? Well, the 2000 decision by the magistrate where things are referred back to the CASB are not compliance issues. They were the administrative issues of the CASB, referring to sending documents to storage, et cetera. They were distinctly different than compliance. It was not compliance that was referred back to CASB. So class counsel is incorrect with that. So were there issues still pending before the magistrate? Not issues pending before the magistrate. There are issues that are still pending before the district court, and that is... No, I don't understand this. There was this argument, as I understood it, that the attorneys had identified people, had a list of people. And for whatever reason, those people were not – their claims were not being paid. And you heard counsel say the corporation refused to give the attorneys the data. That is incorrect. What class counsel cites to that are his own declarations. That is not true. So there was no million-dollar relocator commitment by the corporation? There was never a commitment in stone. In 2013... No, I don't need it in stone. Sure. I need it to know whether the parties reached the agreement, and either the magistrate judge or the board understood that, or it was just something between the parties. No, it was just something between parties. It was nothing that was ever... All right. So what is your understanding of the relocator commitment that was agreed to between the parties? In 2013? Due to the passage of time... No, I'm back in 2009. Correct. In 2009, I don't think anything was ever – I mean, there's the locator fee project, which was extended between the parties because that's what made sense at the time. And the locator fee was what? Well, locators would go out and search for individuals who had been identified but yet not found. That's within – we're still within this 10-year period. Correct. Correct. So due to the passage of time in this case, I think it's important to remember the class members that we identify at this point, unfortunately a lot of them are deceased. So who we are paying are the descendants and the heirs of the class members, which of course means that we then, in addition to having to track individuals down, we have to make sure that who we have is the right person that is indeed entitled to a benefit from this class. So that's what the corporation said it would do as of 2009? I believe the parties agreed to involve locators at the locator fee project. That initially was supposed to be... I mean, if I go through that record again, will I find that in 2009 that the parties agreed that the corporation was going to make these locator efforts? I don't think it would. I think that's part – the locator fee project is part of the greater – is within the wrap-up agreement. The 2009, I think you'll just find probably in status reports. I don't think it was anything that was actually ever concrete that was agreed to between the parties. The only thing that was concrete was in 2013 where we gave class counsel an additional $250,000. The status report to the district court in 2009, did it make any commitment about locator? I don't believe so, but right now my memory just doesn't – I can't remember to be quite honest. Well, when I was reading the briefs, the first time a status report was mentioned, when I looked at the status report, there was no complaint about what the corporation was doing. Correct. All right, it was a report. Here's how many people were paid, et cetera. Correct. Then later on, there's a subsequent status report where there is a complaint, and all I'm trying to figure out is whether that happened within this 10-year period or there was some other agreement between the parties. Right. I think the complaint started after the 10-year period. Our position is that class counsel had 10 years to come forward. He had options. If he felt that class members were not being paid, he had 10 years to come forward. He could have brought an APA action on behalf of his clients. Each member of the class is represented by a class counsel. He absolutely could have brought an APA action. He could have come before the district court. Well, he could have done a number of things, but you have acknowledged here that the parties had agreed that these efforts were going to be made. What I was agreeing to was the locator fee project that was part of the wrap-up agreement that initially was supposed to be three years, but between the parties, because it made sense at the time, was extended. But it was extended not because in any way it was ambiguous as class counsel moved. It was just because of what made sense at the time between the parties. Let me ask you, Betha. Am I confused? In 2002, hadn't something like 90% of the beneficiaries been found? Correct. By 2002, I believe it was over 117 class members that had been paid. How many? I'm sorry. How many? 117,000 class members. Well, I thought it was, and that produced the $85 million in attorney's fees? When did that amount add up to? When was that? I thought that was in 2002 based on hundreds of thousands of people being found. I believe that's at the time of the district court's decision by the time we reached 2016, where we have $85 million. $85 million. Approximately. How many hundreds of thousands of people had been found by then? By now? By then. By then. By the time we reached the wrap-up agreement, it's over 117,000. Oh, when the district court order came down. Oh, it's over 125,000. Okay. And within the 10-year period, I mean, a great deal of progress was made because by the time we get to 2010, 96% of the class had been found and paid. So a great deal of progress has been made. Class council now is essentially trying to backstep on his initial promise that was made between the parties. There's nothing ambiguous about the terms of the wrap-up agreement. The terms started August 31, 2002 and explicitly ended August 31, 2012. Class council, if you follow his interpretation of the wrap-up agreement, we would essentially be bound by class council. Class council also applies the doctrine of prevention, but PBC's position is that there is no... I'm sorry. Would you like some water? No. Okay. PBC did not hinder or prevent class council from receiving his settlement benefits. There was nothing that, you know, despite his action or inaction, class council received 8% of settlement benefits. Okay, so just help me with one other figure. The $250,000, what year was that paid? That was 2013. All right. Class council also believes that the 2007 decision is the law of the case in this decision, but this is distinctly different. That decision was not hindered on attorney's fees. He tries to make them similar, but they are not in any way similar. Sure. So the corporation's position is that the wrap-up agreement entitled plaintiff's counsel to 8% for this 10-year period, that after that, namely in 2013, the corporation agreed to pay $250,000 to class council in connection with further efforts to locate proper claimants. And that was the extent of any financial commitment by the corporation to the plaintiff's counsel, the class council. So any money that class council decided to spend over that $250,000 was simply a voluntary act on behalf of class council. All right. Will you get some help? Yeah, call the nurse's office. Do you have any questions? Yeah. All right. Why don't you sit down for a moment? Yeah. All right. Do you want to call Connolly for PBGC? Yes. Any additional amounts spent over that were entirely voluntary. All right. And just to back up for a moment to the million-dollar so-called agreement, that was never finalized. There were demands being made by class council in order to come up with that million-dollar agreement that PBGC was not willing to agree to. So that was never crystallized. When it was reported to the court in a status agreement, it was in the process of being worked on, and it was never finalized. Thank you. Any more questions? No. Any other questions? Thank you. Thank you. Wait just a second. Okay. Thank you.  Does Mr. Ates have any time left? All right. Why don't you take a minute or two minutes? Thank you, Your Honor. Judge Rogers, in response to your questions, the 2009 Joint Status Report is in the record at JA. No, I said, you know, I read it. Right. Where is any complaint about the corporations dragging its feet or something like that or not following the standards? Well, that came in the briefing prior to 2007. You'll notice in status reports starting in 2004 leading up to the motion to refer this to CASB that we're complaining of the processing issues that were occurring. And this was a referral back to determine compliance with the agreement. If you look at Judge Roberts' order at JA95, it's referred back to CASB for determination of the pending administrative issues related to the party's compliance with the wrap-up agreement. That was the point of the referral back. And instead of allowing that compliance audit to occur, the parties agreed differently to this $1 million project. And I'll note in the record at JA318 through 324 is the agreement with Navigant Consulting with handwritten changes and people's signatures on it indicating that this project was to move forward. And Judge Sentille, that's when the prevention certainly started to occur. We had an obligation to work with Navigant to find these people. They did not fund the project. It was only after 2013, after mediations, because they had not paid to start this, that the $250,000 tap turns on, we re-go find people, we put in our own money, and $25 million flows out of the tap at that point after the 10-year period. This contract should be interpreted in light of the intent of the parties, which was not to put us at the mercy of PBGC not paying, number one. And number two, the doctrine of prevention applies. Thank you. Thank you.
judges: Henderson, Rogers, Sentelle